UNITED STATES of America, Appellee,

v.

Orville N. HICKS, Appellant.

No. 79–1859.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1980.

Decided April 18, 1980.

David R. Gienapp, Arneson, Issenhuth & Gienapp, Madison, S. D., for appellant.

Herbert A. Becker, Sp. Asst. U.S. Atty., Fargo, N. D. (argued), on brief are Terry Pechota, U.S. Atty., Sioux Falls, S. D., on brief, for appellee.

Before LAY, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

For a number of years, including 1976, 1977 and 1978, Orville N. Hicks, hereinafter at times called defendant, was the Superintendent of the Lower Brule Indian Agency in Lower Brule, South Dakota. As Superintendent he administered in cooperation with the Indians certain federal programs involving expenditures of federal funds, including a drought relief program that was operative in 1977 and 1978. In connection with that program the defendant submitted various written financial statements and vouchers to his agency, the Bureau of Indian Affairs (BIA), which is, of course, an agency of the United States.

In March, 1979 the federal grand jury for the District of South Dakota returned an indictment charging the defendant with embezzlement of government funds and property in violation of 18 U.S.C. § 641, and with having willfully made false statements to the BIA in violation of 18 U.S.C. § 1001. The embezzlement counts were Counts I, V and VI. The false statement counts were

Counts II, III and IV. The first four counts were related to each other. Counts V and VI bore no relation to the earlier counts.

The defendant pleaded not guilty to all counts and was tried to a jury with District Judge Donald J. Porter presiding.

Mr. Hicks was found not guilty on all three of the embezzlement counts but was found guilty on the three false statement counts, Counts II, III and IV.

Having been convicted, the defendant was sentenced on Count II to imprisonment for two years, but with only sixty days to be served in a jail type of institution; the remainder of the term was to be spent on probation. Defendant received the same sentence on Count III and Count IV with the stipulation that the sentences on all three counts were to run concurrently.

The defendant was also fined $5,000.00 on each count but with the stipulation that the fines were concurrent. That is, the defendant could satisfy all three fines by paying one of them.

The defendant duly prosecuted this appeal.

For reversal the defendant contends that the trial court erred in denying his motion or motions for judgment of acquittal, which contention raises the question of the sufficiency of the evidence to sustain the verdicts on the false statement counts.

It is also contended that the trial court erred in instructing the jury that the allegedly false statements contained in the documents submitted to BIA were material as a matter of law, and that the trial court erred in its answer to a certain question propounded by the jury in the course of its deliberations.

Insofar as pertinent to this case, § 1001 provides:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Another statute that we should mention is the familiar "aiding and abetting" statute, 18 U.S.C. § 2. That statute provides in substance that a person is guilty of an offense not only if he commits it directly and personally but also if he knowingly "aids, abets, counsels, commands, induces or procures its commission . . . ." 18 U.S.C. § 2(a).

I.

█ In order to convict the defendant on the false statement counts it was necessary for the government to prove by the evidence and beyond a reasonable doubt that the documents in question related to a matter within the jurisdiction of a department or agency of the United States, which they unquestionably did; that the respective documents contained false, fictitious or fraudulent statements or representations; that those false statements were material; that the defendant prepared and submitted the documents to the BIA, or that he was so involved in the preparation and submission of the documents as to bring 18 U.S.C. § 2(a) into play; that the defendant knew that the documents contained or when completed would contain false, fraudulent, or fictitious statements; and that in his dealings with the BIA based on the documents under consideration he acted "willfully," as that term is now generally understood in the field of federal criminal law. *See* in that connection the definition of "willfully" that appears as § 14.06 of E. Devitt & C. Blackmar, Federal Jury Practice and Instructions (3d ed. 1977); *see also* the cases cited following that section.

█ While it was necessary for the government to prove, among other things, that the alleged false statements or representations were material, it was not necessary for the government to show that its agency actually relied on the documents here involved, or that the government actu-

ally suffered financial loss as a result of the alleged conduct of the defendant. *See United States v. Jones*, 464 F.2d 1118, 1121–22 (8th Cir. 1972), *cert. denied*, 409 U.S. 1111, 93 S.Ct. 920, 34 L.Ed.2d 692 (1973); *United States v. Godel*, 361 F.2d 21, 24 (4th Cir.), *cert. denied*, 385 U.S. 838, 87 S.Ct. 87, 17 L.Ed.2d 72 (1966).

In passing on the sufficiency of the evidence to sustain the conviction we must view the whole body of the evidence in the light most favorable to the government and give to the government the benefit of all inferences in its favor reasonably to be drawn from the evidence. *United States v. Berry*, 599 F.2d 267, 268 (8th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979), and cases cited.

■ Where in a federal criminal prosecution it is necessary for the government to prove the existence of a particular state of mind or intent on the part of the defendant, the requirement may be met by circumstantial evidence, and as a matter of fact it frequently cannot be met in any other way. *See United States v. Arnold*, 543 F.2d 1224, 1225–26 (8th Cir. 1976), *cert. denied*, 429 U.S. 1051, 97 S.Ct. 765, 50 L.Ed.2d 768 (1977); *United States v. Wisdom*, 534 F.2d 1306, 1308 (8th Cir. 1976); *United States v. Diggs*, 527 F.2d 509, 512 (8th Cir. 1975).

## II.

Count I of the indictment charged that on or about June 19, 1978 the defendant embezzled, stole and converted to his own use the sum of $4,240.00 which was money of the United States and had come into the possession of the defendant in his capacity as Superintendent of the Lower Brule Agency, BIA, in violation of 18 U.S.C. § 641. The defendant was found not guilty on that count, but we mention it here because it is related to Counts II, III and IV, which charged violations of 18 U.S.C. § 1001, and on which counts the defendant was found guilty.[1]

Count II charged that on or about October 20, 1977 the defendant willfully and knowingly made and used, and aided and abetted the making and using of a statement that was materially false and was in connection with a matter within the jurisdiction of BIA. Specifically, the charge was that on the occasion in question the defendant knowingly and willfully altered and aided and abetted in the alteration of an "estimate" that had been submitted by a business concern identified as "Hickey Drilling" so that the "estimate" after alteration resembled an "invoice."

Count III charged in substance that on or about December 1, 1977 the defendant, with requisite knowledge and intent, submitted to BIA a purported purchase order and amendment thereto, and in that connection falsely stated that the items mentioned in the purchase order "had been inspected, accepted and received by him and conformed to contract, all in violation of 18 U.S.C. § 1001."

And Count IV charged that at or about the same time the defendant, with the requisite knowledge and intent, submitted to BIA a false, fictitious and fraudulent document that purported to be a statement from "Kersting Ditching" showing a total of $1240.80 due for "pipeline construction."

The documents referred to in Counts II, III and IV of the indictment were in fact submitted to the BIA and resulted ultimately in the issuance of two government checks in favor of the defendant. One of those checks was in the sum of $3,000.00; the other was in the sum of $1240.00. Those two checks make up the sum of $4,240.00 mentioned in Count I of the indictment.

The evidence reflects that those checks were held for a time in a safe in the office of the Lower Brule Agency. Later they were deposited in an interest bearing savings account in the name of the defendant in a local bank.

1. Counts V and VI charged embezzlements or conversions of certain tangible items of government property. Those counts were not related to the first four counts; the defendant was acquitted with respect to them, and we will not refer to them again.

There was evidence that while cosignatures were required before the defendant could withdraw the proceeds in question from the bank, it also appears that he was able to withdraw the funds without the cosignatures, and that he used the money for his own benefit. After an investigation had been commenced, the defendant repaid the money to the government with interest.

The fact of the repayment evidently influenced the jury in finding the defendant not guilty on Count I, but the fact that he was acquitted on that count did not necessarily entitle him to acquittals on the false statement counts.

### III.

■ We turn now to the question of the sufficiency of the evidence to sustain the defendant's convictions on Counts II, III and IV.

As in many cases of this kind, the evidence can be viewed from either one of two standpoints, one favorable to the government, and the other favorable to the defendant. As has been seen, we are required to view the evidence in this case in the light most favorable to the government, and when the evidence is so viewed we think that the jury justifiably could have found the following facts, some of which are not in dispute.

The defendant, Hicks, is a long time employee of the BIA and prior to 1977 had been in charge of the Lower Brule Agency for quite a number of years.[2]

In 1976 and 1977 the Lower Brule Indian Reservation was faced with a drought problem to the solution of which BIA and the Indians concerned turned their attention. Solution of the problem involved the digging of water wells and the laying of pipelines to conduct water from the wells to sites where it was needed. The relief program involved participation by the BIA and by Indian tribal authorities. Apparently federal money as well as tribal money was involved.

Three contractors seem to have been involved in or connected with the program. Those contractors are identified in the record as "Hickey Drilling," "Kersting Ditching" and Sather Drilling Co." They were engaged, whether inclusively or exclusively, in the businesses of drilling water wells, digging ditches and laying pipe.

From the federal standpoint, the project, including its financial aspects, was largely under the administration of the defendant. He evidently had a good deal of contracting authority, and the BIA made disbursements of government funds on the basis of documents submitted by the defendant, and which were signed by him, and which were prepared by him or by his clerical personnel in the agency office. Apparently at times defendant would sign important documents in blank and leave them to be filled in by his subordinates.[3]

In 1977 BIA funds to the extent of $6,000.00 appear to have been obligated with respect to contracts that Hickey and Kersting were supposed to perform. Each contemplated contract was in the sum of $3,000.00. Hickey submitted an "estimate" of $3,000.00 with respect to the work that it was supposed to do. However, neither Hickey nor Kersting performed any work on or supplied any materials for the project.

According to the defendant, Sather contracted to perform and did perform work and provide materials to the extent of $6,000.00, but in the fall of 1977 no money had been obligated to discharge the obligation to Sather. Again according to the defendant, Sather was ultimately paid out of tribal funds.

There was evidence from which the jury permissibly could have found that on or

---

2. The Lower Brule Agency would appear to be the administrative headquarters of the Lower Brule Indian Reservation which is maintained for the benefit of Indians who are members of the Brule Branch or tribe of the Sioux Nation.

3. That practice is sometimes used by a supervisory employee to provide himself with a shield should he be accused of fraud or false statements in connection with documents that he signed with full knowledge that they would be completed and with full knowledge as to how they would be filled out.

about October 20, 1977 the defendant knowingly and willfully converted or caused to be converted, or aided and abetted in the conversion of the "estimate" submitted by Hickey into what appeared to be an invoice in the sum of $3,000.00, that this conversion was false, and that the defendant knew that it was or would be false.

There was also evidence from which the jury permissibly could have found that on or about December 1, 1977 the defendant knowingly and willfully prepared a purchase order and an amendment thereto, or caused such documents to be prepared, or aided or abetted in the preparation thereof, which indicated that Hickey Drilling had performed work under contract to the extent of $3,000.00, and that the defendant had "accepted, inspected and received the work" and that the work "conformed to contract, which purchase order and amendment were false and known to the defendant to be false."

Those documents which are the bases for Counts II and III were submitted in due course to the BIA and resulted in a check in the sum of $3,000.00 being drawn in favor of the defendant and transmitted to him.

The jury was also justified in finding that on or about December 1, 1977 the defendant knowingly and willfully prepared or was culpably involved in the preparation of a fictitious "statement" that indicated that Kersting had performed work on the project of the value of $1240.00. That false statement was submitted in due course to the BIA, and resulted ultimately in the issuance of a check on BIA funds in the amount just indicated, which check was transmitted to the defendant.

Apart from a feeble effort, which we reject, to shift blame for the false documents from himself to his subordinates, the defendant says that when he realized that the funds allocated to Hickey and Kersting would not be needed, and that there were no funds available to pay the just claim of Sather, he simply "cut red tape" by causing checks on the Hickey-Kersting allocations to be drawn in favor of himself with the intent and purpose of turning the proceeds of the checks over to Sather in due course. He also says that when it developed that Sather had been paid out of other funds, the $4,240.00 here involved was returned to the government. Defendant omits to mention the evidence that the funds in question had been used for his own benefit and had been repaid only after a criminal investigation had been commenced.

It was up to the jury to say whether and to what extent it accepted defendant's explanation of the transactions that we have discussed. Assuming that the explanation was true, it would not have constituted a defense to the false statement charges. At best, the defendant knew that he was submitting for whatever purpose, whether good, bad or indifferent, false financial documents that would cause expenditures of federal moneys for work that had not been done by the persons or firms referred to in the documents.

As an experienced and responsible government employee the defendant must have known that he should not deal with the government's business in such a fast and loose manner, and that having obtained the checks payable to his personal order but in his official capacity he could not permissibly hold the checks indefinitely in a safe in his office, and finally cash them and place the proceeds in a personal savings account in a bank.

The problem that is presented in this case closely resembles the problem that arises in conspiracy cases brought under 18 U.S.C. § 371 and in which the defendants are charged with having conspired to "defraud the United States." In § 371 cases it is well established that a conspiracy to "defraud the United States" is not limited to cases in which the object of the conspiracy is wrongfully to deprive the government of money or property. The government is entitled to have its programs administered in a legitimate and orderly manner and in accordance with prescribed procedures, and in legal contemplation the government is "defrauded" if its programs are knowingly interfered with, subverted or obstructed. *See* the overall discussion appearing in both the majority and dissenting opinions in *United States v. Anderson*, 579 F.2d 455 (8th Cir.),

*cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978).

In sum, we hold that the evidence was sufficient to sustain the convictions on Counts II, III and IV.

### IV.

Finally, the defendant contends that the trial court erred in instructing the jury that the statements and representations involved were material as a matter of law, and also contends that the trial judge did not answer properly a question propounded by the jury during its deliberations. Those contentions are without merit.

The question of materiality of a false statement or representation in § 1001 context is one of law, and we agree with the district court that as a matter of law the contents of the documents that we have described, if false, were material. *See United States v. Jones, supra*, 464 F.2d at 1123–24.

When the jury left the courtroom to begin its deliberations, the trial judge permitted it to take to the jury room a copy of the court's instructions and apparently permitted the jury to take with it a copy of the indictment as well. That practice is a permissible one, but it can be unwise.

As is well known to judges and criminal lawyers, federal statutes like § 1001 are frequently drawn in the disjunctive. That is, Congress says that it is a crime to do this "or" that. However, it is a rule of federal pleading that an indictment must charge in the conjunctive, namely that the defendant did this "and" that; however, upon trial the government may prove and the trial judge usually instructs in the disjunctive form used in the statute.

In this case, at least one of the jurors observed that Count II of the indictment used the term "make *and* use," (emphasis added) whereas an instruction dealing with Count II referred to "make *or* use," (emphasis added). The difference seems to have caused some confusion, and the jurors asked for a clarification. The judge advised them simply to consider the instructions as a whole. Having presumably done so, the jury found the defendant guilty on Count II, as well as on Counts III and IV.

We see no prejudicial error. The answer given by the trial judge was not improper in itself. Had the judge elaborated on the subject by giving essentially the explanation that we have just given as to the difference between indictment language, on one hand, and statutory and instructional language, on the other hand, the elaboration could not conceivably have been of any benefit to the defendant. Indeed, the best that he could hope for was that after the trial judge answered the question as he did, the jury would remain confused and would resolve the confusion by finding him not guilty on Count II. That did not happen.

The judgment of the district court will be affirmed.